FILED

Gregory L. Weeks, Esq., CSB No. 58584
    Email:  gweeks@wknjlaw.com
Gregory K. Nelson, Esq. CSB No. 203029
    Email:  gnelson@wknjlaw.com
Chandler G. Weeks, Esq., CSB No. 245503
    Email:  chandlerw@wknjlaw.com
WEEKS, KAUFMAN, NELSON & JOHNSON
462 Stevens Avenue, Suite 310
Solana Beach, CA 92075
Telephone:  (858) 794-2140
Facsimile:  (858) 794-2141

Attorneys for Plaintiff, Red.com, Inc.

2011 DEC 21  PM 1:00

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

UNITED STATES DISTRICT COURT,

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| RED.COM, INC. dba RED DIGITAL CAMERA, a Washington corporation,<br><br>     Plaintiff,<br><br>     vs.<br><br>ARRI INC., a Delaware corporation, and MICHAEL BRAVIN, an individual,<br><br>     Defendants. | Case No.  **SACV11-01972 CJC (ANx)**<br><br>**COMPLAINT FOR UNFAIR COMPETITION BASED ON EMAIL HACKING, INVASION OF PRIVACY, CONVERSION, MISAPPROPRIATION OF TRADE SECRETS, FALSE ADVERTISING, UNFAIR COMPETITION UNDER THE LANHAM ACT, UNLAWFUL TRADE PRACTICES UNDER CAL. BUSINESS & PROFESSIONS CODE § 17200, INTENTIONAL AND NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE, NEGLIGENCE, TRESPASS TO CHATTELS, AND UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Complaint

1

Plaintiff Red.com, Inc. dba Red Digital Cinema (hereinafter referred to as "RED"), complains of Defendants ARRI, Inc. (hereinafter referred to as "ARRI") and Michael Bravin (hereinafter referred to as "Bravin") (collectively referred to as "Defendants") and alleges as follows:

## THE PARTIES

1.     RED is a corporation organized and existing under the laws of the state of Washington having its principal place of business at 34 Parker, Irvine, California 92618.

2.     RED is informed and believes, and thereupon alleges, that Defendant ARRI Inc. is a Delaware corporation with it headquarters at 617 Route 303, Blaurett, New York 10913. RED is also informed and believes, and thereupon alleges, that ARRI has corporate offices located at 600 North Victory Blvd., Burbank, California 91502.

3.     RED is informed and believes, and thereupon alleges, that Defendant Bravin is an individual residing in Los Angeles County, California, within this judicial district.  The acts that give rise to the claim against Defendant Bravin occurred within this judicial district, specifically Orange and Los Angeles counties. Within the last year, Bravin was indicted on charges of unlawfully accessing the email server of Band Pro Film & Digital, Inc. ("Band Pro"), under 18 U.S.C. § 1030(a)(2)(c) (Case No. 11-cf-00807-SH, United States District Court, Central District of California). RED is informed and believes, and thereupon alleges that on or about December 19, 2011, Bravin was sentenced.

4.     RED believes that ARRI is vicariously liable for the acts of Bravin. At all times surrounding the acts and activities alleged in this complaint, Bravin was ARRI's Vice-President of Market Development for Digital Camera Products. RED is informed and believes, and thereupon alleges, that at all times relevant to this complaint, ARRI knew of, condoned, encouraged and/or relied upon the acts of Bravin.  Further, RED is informed and believes, and thereupon alleges, that at

Complaint

all times relevant to this complaint, Bravin was acting in furtherance of the business of ARRI and for the benefit of ARRI.

## JURISDICTION AND VENUE

5.     Jurisdiction over this action is founded upon 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332 and 1367.

6.     Venue is proper under 28 U.S.C. § 1391(b) and (c). Plaintiff and Defendants are doing business in California and/or residing in California. Defendants are subject to personal jurisdiction in California. The acts that give rise to all claims of this complaint also occurred in this judicial district and the damage to RED occurred in Orange or Los Angeles County, California.

## BACKGROUND

### Email Hacking

7.     RED is the inventor, developer, manufacturer and seller of ultra-high definition, digital still and motion cinema cameras.  In 2008, RED released an industry sensation, the RED ONE 4K digital cinema camera. In 2009, RED announced a new camera called the RED EPIC, which began selling around the end of 2010. These digital cinema cameras have been used to shoot many blockbuster movies, since their introduction.

8.     These advances in digital cinema acquisition and post-production by RED led to a revolution in filmmaking in Hollywood and elsewhere. Since their introduction, RED's cameras have been used in several blockbuster movies, setting the new trend for filming. In the wake of RED's advancements, others were looking to begin development and use of digital cinema cameras.

9.     Band Pro Film & Digital, Inc. is a company located in Burbank, California. The company was founded in 1984 by Amnon Band. Band Pro is a recognized leader in the filming industry for supplying cameras, lenses, audio, power and lighting equipment.  Band Pro has been involved in many blockbuster productions.

Complaint

10.   RED is informed and believes, and thereupon alleges, that Bravin was employed at Band Pro from 1995 through 2010. RED is informed and believes, and thereupon alleges, that his final position at Band Pro was Chief Technology Officer, and he was instrumental in expanding the market for high-definition technology for digital cinema.

11.   RED is informed and believes, and thereupon alleges, that during his employment with Band Pro, Bravin obtained the user name and password for the email account of Amnon Band.

12.   In 2009, RED and Band Pro had numerous business discussions related to the future of digital cinema cameras and digital high-definition. RED and Band Pro had many discussions regarding potential joint ventures. During these discussions, and subject to terms of a confidentiality agreement, Band Pro was given access to the workings of the RED cameras, including the specifics of the RED EPIC camera.  Bravin was a part of many of these discussions and aware of certain technical advantages and information related to the RED technology.

13.   In 2010, ARRI introduced a new digital cinema camera called the Alexa. The Alexa was intended to be a competitor to the RED cameras, and specifically the RED EPIC camera.

14.   RED is informed and believes, and thereupon alleges, that in or about December 2009, Bravin resigned at Band Pro and in January 2010, he joined ARRI. RED is informed and believes, and thereupon alleges, that Bravin was employed as Vice-President of Market Development for Digital Camera Products and worked out of ARRI's Burbank office.  RED is informed and believes, and thereupon alleges, that Bravin's responsibilities at ARRI were marketing, training and education on the Alexa camera, and generally handling the development and marketing of the Alexa camera.

… … …

… … …

Complaint

15.    At least on January 19, 2010, and on other occasions between December 2009 and June 2010, Bravin intentionally accessed the computer used in interstate commerce belonging to Band Pro, without authorization and obtained information from that computer.  RED is informed and believes, and thereupon alleges, that Bravin used the username and password of Amnon Band to access the computer and take information from Amnon Band's email account, including emails from Jim Jannard, the owner of RED, and others at RED.  RED is informed and believes, and thereupon alleges, that on more than one occasion, Bravin used ARRI's computers at the ARRI Burbank location to access the Band Pro computers and Amnon Band's email account. RED is also informed and believes, and thereupon alleges, that on more than one occasion Bravin forwarded emails that he unlawfully obtained from Band Pro to colleagues at ARRI.

16.    Bravin, without permission and unlawfully, accessed and/or copied thousands of emails from the Band Pro server, including emails from RED personnel, specifically including Jim Jannard. RED is informed and believes, and thereupon alleges, that Bravin's purpose in reviewing these numerous emails on a regular basis for a over half a year, at the same time ARRI was attempting to launch its Alex camera was corporate espionage and an effort was to gain confidential, proprietary information regarding competitors, including RED, to provide ARRI an unfair business advantage against its competitors, including RED, in bringing its ARRI Alexa camera to market.

17.    RED is informed and believes, and thereupon alleges, that Bravin undertook this course of action to hack emails from Amnon Band's email account to, among other things, gain confidential information related to the RED EPIC camera to use for the advantage of ARRI in the release of their Alexa camera. RED is informed and believes, and thereupon alleges, that Bravin saved or forwarded, either directly or verbally, the information obtained from the Band Pro emails to other ARRI executives and employees.

Complaint

18.     RED is informed and believes, and thereupon alleges, that at all times that Bravin undertook his actions of hacking the email account of Amnon Band, he was an employee and officer of ARRI.  RED is further informed and believes, and thereupon alleges, that Bravin undertook this course of action with the knowledge and consent of ARRI.  RED is informed and believes, and thereupon alleges, that ARRI knowingly used competitive information about RED, gathered by Bravin from the email account of Amnon Band, for its own advantages.

19.     RED is informed and believes, and thereupon alleges, that Glenn Kennel ("Kennel") and Bill Russell ("Russell"), executives of ARRI, had firsthand knowledge of Bravin's hacking activities.

20.     On or about August 22, 2011, Bravin was indicted for computer fraud and email hacking. On or about September 12, 2011, Bravin was arraigned, and on or about September 22, 2011, Bravin pled guilty to unlawfully accessing the email server of Band Pro, under 18 U.S.C. 1030(a)(2)(c). Bravin signed a plea agreement with the United States Attorney's Office on August 18, 2011, which was filed on September 22, 2011, and accepted by the court. In the "Nature of the Offense" section of Bravin's plea agreement, his crime is described as follows:

"1) defendant intentionally accessed without authorization or exceeded authorized access to a computer; and 2) by accessing without authorization or exceeding authorized access to a computer, the defendant obtained information from a computer that was used in or affected commerce or communication between one state and another state, or between a state of the United States and a foreign country. **Defendant admits that defendant is, in fact, guilty of this offense as described in the single-count information.**" (emphasis added)

21.     Bravin's plea agreement also states the following:

"Defendant and the USAO agree to the statement of facts provided below: "On or about January 19, 2010, in Los Angeles County, California, defendant intentionally accessed the computer used in interstate commerce belonging to Band Pro Film & Digital, Inc.

Complaint

("Band Pro"), without authorization and obtained information from that computer. Defendant obtained the user name and password for the Band Pro email account of Amnon Band, President and Chief Executive Officer of Band Pro, during defendant's employment with Band Pro. Defendant resigned from Band Pro in December 2009, and began to work for another company. After resigning from Band Pro, from approximately December 2009, through June 2010, including on January 19, 2010, defendant accessed, without authorization, Amnon Band's email account and thereby read Band's emails. The total loss to Band Pro from defendant's unauthorized accessed totaled at least $5,001."

22.　Mr. Bravin admits that he forwarded emails that he obtained from Amnon Band's email account to colleagues at ARRI on at least two occasions.

23.　The actions of Bravin clearly appear to show a pattern of corporate espionage facilitated by Bravin's hacking activities. RED is informed and believes, and thereupon alleges, that the probation officer's report indicates that Mr. Bravin logged into Mr. Amnon's emails to retrieve "sensitive information pertaining to Band Pro's business strategies and product information." RED is informed and believes, and thereupon alleges, that the same report allegedly indicates that Mr. Bravin may have also helped ARRI design a new type of camera that is in direct competition with Band Pro's cameras while relying on the information obtained from Band Pro's emails.

24.　As a result of all the activities undertaken by Bravin, individually and on behalf of ARRI, RED has been injured in an amount to be proven at trial. RED seeks damages, disgorgement, restitution, and injunctive relief related to Defendants' acts. Further, unless and until enjoined by this Court, the Defendants have shown a complete disregard for the rights of RED and injuries they cause to RED. Consequently, RED seeks a preliminary and permanent injunction barring ARRI from its continued benefit obtained from the unlawful intrusion into the private emails and reliance on the proprietary and confidential information of RED.

Complaint

**False Posts On RedUser.net**

25.     A web-blog board related to all things RED is maintained by Landmine Media, LLC at www.reduser.net ("RedUser").  The board is a public forum for anyone to post questions and gather information about RED products and using RED products. One of the policies of the forum is that users are to use their real names.

26.     During his employment at ARRI, Bravin posted on RedUser on multiple occasions using both his real name and also a false name. RED is aware that between May 11, 2008 and July 2010, Bravin posted on RedUser. During some period of time in 2010, including at least July 2010, Bravin posted on Reduser under a false name, including at least "Ed Carlton." RED is aware that as Ed Carlton, Bravin posted on RedUser from both ARRI computers at work (IP address 66.214.254.126) and from his personal computer at home (IP address 68.123.249.85). During December 2009 and July 2010, Bravin used the forum to make disparaging remarks regarding RED and encouraging viewers to instead look for and purchase the ARRI Alexa camera. Among other things, Bravin falsely asserted that the ARRI Alexa camera was a superior camera to the RED EPIC camera, and otherwise attempted to encourage Redusers to use the ARRI camera and divert sales from RED.

27.     On more than one occasion, RED warned ARRI about Bravin's activities of posting on RedUser.  Specifically, on or about at least July 21, 2011, Russell, Kennel, and Bravin met with Jim Jannard and Jarred Land at Red Studios Hollywood. Russell, Kennel and Bravin were told that RED had learned that Bravin was falsely posting as a "ghost" on RedUser, using the forum to trumpet the ARRI Alexa camera.  Bravin denied the allegations, until confronted with proof by Jarred Land, including identifying the IP addresses used and tying them to the username.  Bravin commented, essentially (paraphrase): So, I guess since you don't believe me on this, you don't believe anything I say. Russell and Kennel

made no specific acknowledgement of the postings, but were given the evidence. Bravin (Ed Carlton) stopped posting on RedUser. Based on these points of reference, ARRI was on notice of Bravin's shady business tactics. RED is informed and believes, and thereupon alleges, that Bravin was never disciplined by ARRI for his actions.

28.    As a result of all the activities undertaken by Bravin, individually and on behalf of ARRI, RED has been injured in an amount to be proven at trial. RED seeks damages, disgorgement, restitution, and injunctive relief related to Defendants' acts. Further, unless and until enjoined by this Court, the Defendants have shown a complete disregard for the rights of RED and injuries they cause to RED. Consequently, RED seeks a preliminary and permanent injunction.

### False Advertising

29.    ARRI knowingly engaged in false advertising, ignoring repeated protests from RED, for over two years at the critical launch time of the Alexa camera.  In or about 2010, ARRI was selling another digital camera called the D-21, before the introduction of the Alexa. RED is informed and believes, and thereupon alleges, that in an effort to prepare the industry for the Alexa camera, it began falsely advertising to undermine the RED cameras.  The following are examples from ARRI's website at that time. These statements are clearly directed to the 4K industry leader, RED.

- "WHAT RESOLUTION IS THE D-21 CAMERA? The D-21 has a 3K sensor with a Bayer color filter array that is designed to produce uncompromised 2K or HD pictures. We call it a really good 2K camera. But you really must look at pictures. The D-21 pictures are sharper and cleaner than other cameras claiming 4K resolution do to uncompressed workflow."

- "HOW DOES ARRIRAW COMPARE TO REDRAW? Both formats store the raw data from a Bayer pattern sensor. The big difference is that

the REDRAW format is compressed and ARRIRAW is not. This compression factor is from 8:1 to 12:1."

30.    Since releasing its Alexa camera, ARRI has continued to make false statements in advertising directed toward the RED consumer.

- "WHAT RESOLUTION IS THE ALEXA CAMERA? ALEXA has a 3.5K CMOS Imager yielding either a 2K or 1920 X 1080 HD image. Because [sic] of ALEXA's use of the continuously improving ARRI Imaging Technology (AIT), images are sharper and cleaner than other cameras that claim 4K+ resolution."

- Discussing the sensor, it ARRI states: "Produces cinematic look and feel, high contrast and the highest dynamic range."

- In advertising specifically targeting RED customers, ARRI identifies films that have been shot on the Alexa. Among others, it lists the movie "I Hate You, Dad." In actuality, this movie was shot on RED.

31.    In a post by Bravin on Reduser on or about July 2010, he stated that "We [meaning ARRI] have been offering uncompressed raw with ARRIRAW for 5 years, many people have chosen it. Not by seeing a screening of demo material on a morekay projector in a controlled environment but by shooting tests and taking it through post." In fact, RED is informed and believes that ARRI had not offered ARRIRAW in an uncompressed format for 5 years and it had not been used by many others. Further, RED is informed and believes that no major studio used ARRIRAW to film a movie and take it through post-production in the previous 5 years.

32.    As a result, RED has been injured in an amount to be proven at trial, but believed to be in excess of $75,000. RED seeks damages, disgorgement, restitution, and injunctive relief related to Defendants' acts. Further, unless and until enjoined by this Court, ARRI have shown a complete disregard for the rights of RED; RED thus seeks a preliminary and permanent injunction.

Complaint

# FIRST CAUSE OF ACTION

## Statutory Unfair Competition – Computer Fraud & Hacking
### (Cal. Bus. & Prof. § 17200; 18 U.S.C. § 1030)

33.     RED refers to and realleges paragraphs 1 through 32 above as though fully set forth at this point.

34.     The foregoing conduct and actions of ARRI and Bravin constitute unfair competition under California Business & Professions Code § 17200. Subject matter jurisdiction is proper under 28 U.S.C. § 1367.

35.     Title 18 of the United States Code, Section 1030, makes it a crime to intentionally access a protected, nonpublic computer or to knowingly and with intent to defraud, access a protected computer without authorization and obtain anything of value.

36.     As set forth more fully above, Bravin accessed the private computers of Band Pro and particularly the email account of Amnon Band. RED is informed and believes, and thereupon alleges, that such acts were undertaken with the full knowledge and approval of ARRI, to benefit from the value of the competitive information of RED and others contained on the computers.

37.     As a direct and proximate result of the improper conduct of Bravin and ARRI, ARRI has competitively benefited in the marketing, introduction, and sales of its Alexa cameras. The exact benefit to ARRI has not been calculated. But, RED requests that ARRI and Bravin be required to disgorge to RED the value of the confidential, competitive information obtained from the acts of Bravin's hacking

… … …

… … …

… … …

… … …

Complaint

## SECOND CAUSE OF ACTION

### Invasion of Privacy

38.     The allegations of paragraphs 1 through 32 are repled and realleged as though fully set forth herein.

39.     This is a claim against both Defendants for invasion of privacy. Subject matter jurisdiction is proper under 28 U.S.C. § 1367.

40.     Band Pro maintains a secure computer server for hosting its email accounts. One of those email accounts belongs to Amnon Band, the CEO of Band Pro.

41.     Over a period of several months, employees of RED, including but not limited to Jim Jannard, sent confidential emails that contained proprietary information to employees of Band Pro, including but not limited to Amnon Band.

42.     Bravin was aware of these emails from RED.

43.     During his employment with Band Pro, Bravin gained access to the username and password for the email account of Amnon Band.

44.     Between December 2009 and June 2010, after resigning from Band Pro, Bravin accessed the email account of Amnon Band.  RED is informed and believes, and thereupon alleges, that Bravin undertook these actions to obtain confidential, proprietary competitor information, including from RED, to use for the benefit of ARRI in marketing the Alexa camera and competing with RED.

45.     RED is informed and believes that Bravin undertook these activities personally, as an officer of ARRI, and with the with the knowledge and approval of other officers and/or employees of ARRI.

46.     Based on the unauthorized access and copying of emails, Bravin and ARRI used confidential, proprietary information of RED to improve the Alexa camera and guide the marketing efforts of ARRI with the camera. RED has been injured as a result, as it lost certain competitive advantages to ARRI.  As a direct

Complaint

result, RED has been injured in an amount that has not yet been determined, but which will be proven at trial. RED also seeks punitive damages against both ARRI and Bravin based on the willful and malicious acts of Bravin.

47.   RED is informed and believes, and thereupon alleges, that ARRI used RED's trade secrets to its advantage to develop and/or market the Alexa camera. RED cannot be adequately compensated for its loss of business advantage obtained by ARRI, based on the bad acts of its employee. Accordingly, RED seeks a preliminary and permanent injunction that requires disclosure and return of all trade secrets of RED, any advantages or improvements made based on the trade secrets, and the cessation of all activities that benefit from the reliance on this information.

## THIRD CAUSE OF ACTION
### Conversion

48.   The allegations of paragraphs 1 through 32 are repled and realleged as though fully set forth herein.

49.   This is a claim against both Defendants for conversion.   Subject matter jurisdiction is proper under 28 U.S.C. § 1367.

50.   Band Pro maintains a secure computer server for hosting its email accounts. One of those email accounts belongs to Amnon Band, the CEO of Band Pro.

51.   Over a period of several months, employees of RED, including but not limited to Jim Jannard, sent confidential emails that contained proprietary information to employees of Band Pro, including but not limited to Amnon Band.

52.   Bravin was aware of these emails from RED and that they constituted confidential, proprietary, and private information.

53.   During his employment with Band Pro, Bravin gained access to the username and password for the email account of Amnon Band.

54.   Between December 2009 and June 2010, after resigning from Band

Complaint

Pro and while employed as an officer of ARRI, Bravin accessed the email account of Amnon Band. RED is informed that Bravin took thousands of emails from the Band Pro email account(s), including innumerable emails originating from RED and containing confidential information of RED.

55.  RED is informed and believes, and thereupon alleges, that Bravin undertook these actions to obtain confidential, proprietary competitor information, including from RED, to use for the benefit of ARRI in marketing the Alexa camera.

56.  RED is informed and believes that Bravin undertook these activities personally, as an officer of ARRI, and with the with the knowledge and approval of other officers and/or employees of ARRI.

57.  Based on the unauthorized access and copying of emails, Bravin used confidential, proprietary information of RED to improve the Alexa camera and guide the marketing efforts of ARRI with the camera. RED has been injured as a result, as it lost certain competitive advantages to ARRI. As a direct result, RED has been injured in an amount that has not yet been determined, but which will be proven at trial. RED also seeks punitive damages against both ARRI and Bravin based on the willful and malicious acts of Bravin.

58.  RED is informed and believes, and thereupon alleges, that ARRI used RED's trade secrets to its advantage to develop and/or market the Alexa camera. RED cannot be adequately compensated for its loss of business advantage obtained by ARRI, based on the bad acts of its employee. Accordingly, RED seeks a preliminary and permanent injunction that requires disgorgement of the trade secrets, any advantages or improvements made based on the trade secrets, and the cessation of all activities that benefit from these trade secrets and other proprietary information.

... ... ...

... ... ...

Complaint

## FOURTH CAUSE OF ACTION

### Misappropriation of Trade Secrets

59.    The allegations of paragraphs 1 through 32 are repled and realleged as though fully set forth herein.

60.    This is a claim against both Defendants for misappropriation of trade secrets.  Subject matter jurisdiction is proper under 28 U.S.C. § 1367.

61.    RED is the developer of the digital still and motion cinema camera systems known as RED ONE, EPIC, and SCARLET. In 2009 and early 2010, RED was selling the RED ONE camera and in the early stages of selling the EPIC camera. In 2011, RED introduced the SCARLET camera. The release of the EPIC and SCARLET cameras constituted big industry news.   The specifications, features and prices of these cameras, in addition to some of the internal code and controls, are and were highly confidentially, proprietary information that RED was not disclosing to the public.

62.    RED takes reasonable efforts to maintain the confidentiality of its trade secrets and proprietary information, including but not limited to obtaining non-disclosure agreements from third parties. At all times relevant hereto, RED had a confidentiality/non-disclosure agreement in place with Band Pro. As part of their negotiations and business dealings, RED shared some of its confidential information and trade secrets related to the EPIC and SCARLET cameras with Band Pro. In particular, Jim Jannard and others at RED, shared some of these details with Amnon Band through emails, under the assumption that his emails were secure. RED would certainly not have wanted a direct competitor, such as ARRI, knowing this information, as it would provide ARRI an advantage as it staged the introduction of its Alexa camera.

63.    Band Pro maintains a secure computer server for hosting its email accounts. One of those email accounts belongs to Amnon Band, the CEO of Band Pro. Over a period of time, executives and employees of RED sent emails to

Amnon Band that contained information regarding RED's trade secrets.

64.     Bravin was aware of these emails from RED and that they constituted confidential, proprietary trade secret information. Indeed, RED is informed and believes, and thereupon alleges, that Bravin was aware that RED had been discussing its EPIC camera with ARRI and knew to look for information regarding the EPIC camera in the emails of Amnon Band.

65.     During his employment with Band Pro, Bravin gained access to the username and password for the email account of Amnon Band.

66.     Between December 2009 and June 2010, after resigning from Band Pro and while employed as an officer of ARRI, and without any authorization from either RED or Band Pro, Bravin accessed the email account of Amnon Band. RED is informed that Bravin took thousands of emails from the Band Pro email account(s), including innumerable emails originating from RED and containing RED trade secrets. RED is informed and believes, and thereupon alleges, that the emails taken by Bravin included specifications, features, and/or pricing or marketing strategies related to the EPIC camera.

67.     RED is informed and believes, and thereupon alleges, that Bravin undertook these actions to obtain RED's trade secrets for the benefit of ARRI in marketing the Alexa camera.

68.     RED is informed and believes that Bravin undertook these activities personally, as an officer of ARRI, and with the with the knowledge and approval of other officers and/or employees of ARRI.

69.     Based on the unauthorized access and copying of emails, Bravin used confidential, proprietary information of RED to improve the Alexa camera and guide the marketing efforts of ARRI with the camera. RED has been injured as a result, as it lost certain competitive advantages to ARRI.  As a direct result, RED has been injured in an amount that has not yet been determined, but will be proven at trial. RED seeks as damages to recover the profits from the sale of products that

Complaint

benefited from the trade secret and proprietary information of RED, or alternatively, its own lost profits or a reasonable royalty. RED also seeks punitive damages against both ARRI and Bravin based on the willful and malicious acts of Bravin.

70.     RED is informed and believes, and thereupon alleges, that ARRI used RED's trade secrets to its advantage to develop and/or market the Alexa camera. RED cannot be adequately compensated for its loss of business advantage obtained by ARRI, based on the bad acts of its employee. Accordingly, RED seeks a preliminary and permanent injunction that requires disgorgement of the trade secrets, any advantages or improvements made based on the trade secrets, and the cessation of all activities that benefit from reliance on the trade secrets.

**FIFTH CAUSE OF ACTION**

**False Advertising Under 15 U.S.C. § 1125**

71.     The allegations of paragraphs 1 through 32 are repled and realleged as though fully set forth therein.

72.     This is a claim for false advertising under 15 U.S.C. § 1125(a). Jurisdiction is proper under 28 U.S.C. § 1331.

73.     ARRI knowingly engaged in false advertising as it relates to RED, at the critical launch time of its Alexa camera.

74.     In or about 2010, ARRI was selling a digital camera called the D-21, before the introduction of the Alexa. RED is informed and believes, and thereupon alleges, that in an effort to prepare the industry for the Alexa camera, it began falsely advertising to undermine the RED cameras.  The following are examples from ARRI's website at that time. Although not directly referencing the RED cameras in all instances, these statements are clearly directed to the 4K industry leader, RED.

- "WHAT RESOLUTION IS THE D-21 CAMERA? The D-21 has a 3K sensor with a Bayer color filter array that is designed to produce

Complaint

uncompromised 2K or HD pictures. We call it a really good 2K camera. But you really must look at pictures. The D-21 pictures are sharper and cleaner than other cameras claiming 4K resolution do to uncompressed workflow."

- "HOW DOES ARRIRAW COMPARE TO REDRAW? Both formats store the raw data from a Bayer pattern sensor. The big difference is that the REDRAW format is compressed and ARRIRAW is not. This compression factor is from 8:1 to 12:1."

75.    Since releasing its Alexa camera, ARRI has continued to make false statements in advertising directed toward the RED consumer.

- "WHAT RESOLUTION IS THE ALEXA CAMERA? ALEXA has a 3.5K CMOS Imager yielding either a 2K or 1920 X 1080 HD image. Becase [sic] of ALEXA's use of the continuously improving ARRI Imaging Technology (AIT), images are sharper and cleaner than other cameras that claim 4K+ resolution."

- Discussing the sensor, it ARRI states: "Produces cinematic look and feel, high contrast and the highest dynamic range."

- In advertising specifically targeting RED customers, ARRI identifies films that have been shot on the Alexa. Among others, it lists the movie "I Hate You, Dad." In actuality, this movie was shot on RED.

76.    In a post by Bravin on Reduser in 2010, he stated that "We [meaning ARRI] have been offering uncompressed raw with ARRIRAW for 5 years, many people have chosen it. Not by seeing a screening of demo material on a morekay projector in a controlled environment but by shooting tests and taking it through post." In fact, RED is informed and believes, and thereupon alleges, that ARRI had not offered ARRIRAW in an uncompressed format for 5 years and it had not been used by many others. Further, RED is informed and believes, and thereupon alleges, that no major studio had used ARRIRAW to film a movie and take it

Complaint

through post-production in the previous 5 years.

77.     These statements were made in commerce, and in fact are not true.

78.     As a result of all the false advertising by ARRI, RED has been injured in an amount to be proven at trial. RED seeks damages, disgorgement, restitution, and injunctive relief related to Defendants' acts. Further, unless and until enjoined by this Court, the Defendants have shown a complete disregard for the rights of RED and injuries they cause to RED. Consequently, RED seeks a preliminary and permanent injunction.

## SIXTH CAUSE OF ACTION

### False Advertising Under Cal. Business & Professions § 17500

79.     The allegations of paragraphs 1 through 32 are repled and realleged as though fully set forth therein.

80.     This is a claim for false advertising under California Business & Professions Code § 17500 *et seq*. Subject matter jurisdiction is proper under 28 U.S.C. § 1367.

81.     ARRI knowingly engaged in false advertising as it relates to RED, at the critical launch time of the Alexa camera.

82.     In or about 2010, ARRI was selling a digital camera called the D-21, before the introduction of the Alexa. RED is informed and believes, and thereupon alleges, that in an effort to prepare the industry for the Alexa camera, it began falsely advertising to undermine the RED cameras.  The following are examples from ARRI's website at that time. Although not directly referencing the RED cameras in all instances, these statements are clearly directed to the 4K industry leader, RED.

- "WHAT RESOLUTION IS THE D-21 CAMERA? The D-21 has a 3K sensor with a Bayer color filter array that is designed to produce uncompromised 2K or HD pictures. We call it a really good 2K camera. But you really must look at pictures. The D-21 pictures are sharper and

Complaint

19

cleaner than other cameras claiming 4K resolution do to uncompressed workflow."

- "HOW DOES ARRIRAW COMPARE TO REDRAW? Both formats store the raw data from a Bayer pattern sensor. The big difference is that the REDRAW format is compressed and ARRIRAW is not. This compression factor is from 8:1 to 12:1."

83.    Since releasing its Alexa camera, ARRI has continued to make false statements in advertising directed toward the RED consumer.

- "WHAT RESOLUTION IS THE ALEXA CAMERA? ALEXA has a 3.5K CMOS Imager yielding either a 2K or 1920 X 1080 HD image. Becase [sic] of ALEXA's use of the continuously improving ARRI Imaging Technology (AIT), images are sharper and cleaner than other cameras that claim 4K+ resolution."

- Discussing the sensor, it ARRI states: "Produces cinematic look and feel, high contrast and the highest dynamic range."

- In advertising specifically targeting RED customers, ARRI identifies films that have been shot on the Alexa. Among others, it lists the movie "I Hate You." In actuality, this movie was shot on RED.

84.    In a post by Bravin on Reduser in 2010, he stated that "We [meaning ARRI] have been offering uncompressed raw with ARRIRAW for 5 years, many people have chosen it. Not by seeing a screening of demo material on a morekay projector in a controlled environment but by shooting tests and taking it through post." In fact, RED is informed and believes, and thereupon alleges, that ARRI had not offered ARRIRAW in an uncompressed format for 5 years and it had not been used by many others. Further, RED is informed and believes, and thereupon alleges, that no major studio had used ARRIRAW to film a movie and take it through post-production in the previous 5 years.

85.    These statements were made in commerce, and in fact are not true.

Complaint

86.     As a result of all the false advertising by ARRI, RED has been injured in an amount to be proven at trial, but believed to be in excess of $75,000. RED seeks damages, disgorgement, restitution, and injunctive relief related to Defendants' acts. Further, unless and until enjoined by this Court, the Defendants have shown a complete disregard for the rights of RED and injuries they cause to RED. Consequently, RED seeks a preliminary and permanent injunction.

**SEVENTH CAUSE OF ACTION**

**Unfair Competition under 15 U.S.C. § 1125(a)**

87.     The allegations of paragraphs 1 through 86 are repled and realleged as though fully set forth herein.

88.     This is a claim against all Defendants for unfair competition under 15 U.S.C. § 1125(a).

89.     Defendants engaged in unfair and deceptive acts by hacking into emails of RED and Jim Jannard on the Band Pro server.

90.     Under 18 U.S.C. § 1030(a)(2)(c), it is unlawful for anyone to intentionally access a computer without authorization and obtains information from any protected computer.

91.     Bravin intentionally accessed the email servers at Band Pro, in interstate commerce, between December 2009 and July 2010. RED is informed and believes, and thereupon alleges, that during this period of time he accessed and obtained copies of emails from RED and Jim Jannard to Band Pro and Amnon Band. Bravin did not have authorization from Band Pro, Amnon Band, RED, or Jim Jannard to do so.

92.     RED is informed and believes, and thereupon alleges, that ARRI knew of, learned of, and/or condoned the actions of Bravin. Moreover, RED is informed and believes, and thereupon alleges, that ARRI relied on information Bravin obtained from Band Pro's email server for their business purposes, including the introduction of the Alexa camera.

Complaint

93.    The deception and hacking occurred in a course of commerce. Defendants' business practices address the market generally and implicate consumer protection concerns.

94.    Relying on the emails from RED to Band Pro, as well as the trade secrets related to the EPIC and SCARLET cameras, ARRI organized interstate advertising campaigns targeting the RED customer. In doing so, however, ARRI made false representations, such as those cited above.

95.    As a consequence of their deceptive business practices, Defendants have profited in an amount that is yet to be determined. Further, as a direct result of Defendants' actions, RED has been injured in an amount that it yet to be determined, but will be proven at trial. Defendants should be required to account for and disgorge any profits from their unjust enrichment resulting from their deceptive business practices, as set forth above, and compensate RED for its damages.  Further, the Court should issue and injunction prohibiting Defendants from their continued course of deceptive business practices.

## EIGHTH CAUSE OF ACTION

### False Advertising And Unfair Competition Under 15 U.S.C. § 1125

96.    The allegations of paragraphs 1 through 95 are repled and realleged as though fully set forth herein.

97.    This is a claim for false advertising and unfair competition under 15 U.S.C. § 1125.

98.    A blog board related to all things RED is maintained by Landmine Media at www.reduser.net ("RedUser").  The board is a public forum for anyone to post questions and gather information about RED products and using RED products. One of the policies of the forum is that users are to use their real names.

99.    During his employment at ARRI, Bravin posted on RedUser on multiple occasions using a false name. RED is aware that between May 11, 2008 and July 2010, Bravin posted on RedUser under a false name, including at least

Complaint

"Ed Carlton."  RED is aware that as Ed Carlton, Bravin posted on RedUser from both ARRI computers at work (IP address 66.214.254.126) and from his personal computer at home (IP address 68.123.249.85). During December 2009 and July 2010, Bravin used the forum to make many disparaging remarks regarding RED and encouraging viewers to instead look for and purchase the ARRI Alexa camera, touting it as superior to the RED cameras.

100.   Among other things, Bravin made disparaging statements about RED and the RED products, falsely asserted that the ARRI Alexa camera was a superior camera, and otherwise attempted to encourage Redusers to use the ARRI camera and divert sales from RED.

101.   On more than one occasion, RED warned ARRI about Bravin's activities of posting on RedUser.  Specifically, on or about at least July 21, 2011, Russell, Kennel, and Bravin met with Jim Jannard and Jarred Land at Red Studios Hollywood.  Russell, Kennel and Bravin were told that RED had learned that Bravin was falsely posting as a "ghost" on RedUser, using the forum to trumpet the ARRI Alexa camera.  Bravin denied the allegations, until confronted with proof by Jarred Land, including identifying the IP addresses used and tying them to the username.  Bravin commented, essentially (paraphrase): "So, I guess since you don't believe me on this, you don't believe anything I say." Russell and Kennel made no specific acknowledgement of the postings, but were given the evidence. Bravin (Ed Carlton) stopped posting on RedUser. Based on these points of reference, ARRI was on notice of Bravin's shady business tactics. RED is informed and believes, and thereupon alleges, that Bravin was never disciplined by ARRI for his actions.

102.   As a result of all the activities undertaken by Bravin, individually and on behalf of ARRI, RED has been injured in an amount to be proven at trial. RED seeks damages, disgorgement, restitution, and injunctive relief related to Defendants' acts. Further, unless and until enjoined by this Court, the Defendants

Complaint

have shown a complete disregard for the rights of RED and injuries they cause to RED. Consequently, RED seeks a preliminary and permanent injunction.

103.   As a consequence of their deceptive business practices, Defendants have profited in an amount that is yet to be determined. Further, as a direct result of Defendants' actions, RED has been injured in an amount that it yet to be determined, but will be proven at trial. Defendants should be required to account for and disgorge any profits from their unjust enrichment resulting from their deceptive business practices, as set forth above, and compensate RED for its damages.  Further, the Court should issue and injunction prohibiting Defendants from their continued course of deceptive business practices.

## NINTH CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

104.   The allegations of paragraph 1 through 103 are repled and realleged as though fully set forth therein.

105.   This is a claim for interference with prospective economic advantage against both Defendants, arising out of the potential acquisition of Band Pro by RED. Jurisdiction over this claim is proper under 18 U.S.C. § 1367.

106.   Beginning in 2009 and continuing through 2010, RED was in discussions with Band Pro about a potential acquisition. RED was considering acquiring Band Pro. The principal negotiators of the deal were Jim Jannard, for RED, and Amnon Band, for Band Pro. However, Bravin was also aware of the discussions. As such, Bravin was aware of the sensitive nature of the discussions, and the importance of their propriety.

107.   RED is informed and believes, and thereupon alleges, that when he left Band Pro, Bravin harbored animosity for Band Pro. As such, RED is informed and believes, and thereupon alleges, that Bravin undertook a course of action to undermine Band Pro and RED, to the benefit of ARRI. RED is informed and believes, and thereupon alleges, that ARRI was aware of and condoned the

Complaint

activities of Bravin in this regard because he was an officer of the company and conveyed information to other officers and employees of ARRI.

108.   RED is informed and believes, and thereupon alleges, that part of the purpose of Bravin hacking the Band Pro servers was to gain further information regarding the potential acquisition by RED. RED is further informed and believes, and thereupon alleges, that Bravin shared with ARRI the fact that RED was attempting to acquire Band Pro. RED is informed and believes, and thereupon alleges, that Bravin intended that his hacking activities provide an advantage to ARRI and undermine both RED and Band Pro.

109.   After learning that Bravin had hacked the Band Pro email server, RED was concerned about what information regarding a potential acquisition had been wrongly discovered. Moreover, Bravin being a former Band Pro employee cast a shadow over Band Pro's reputation going forward. Consequently, the acquisition of Band Pro had lost its value to RED.

110.   RED is informed and believes, and thereupon alleges, that Bravin, with ARRI's knowledge and consent, hacked the email system in an effort to gain access to information regarding the acquisition.

111.   RED is further informed and believes, and thereupon alleges, that Bravin, with ARRI's knowledge and consent, posted injurious messages on RedUser in an effort to undermine both RED and Band Pro, and interfere with the potential acquisition.

112.   As a result of Bravin's hacking and false posts on RedUser, RED determined to not acquire Band Pro.  As a result, RED was directly damaged, in an amount to be proven at trial. Given the malicious and offensive nature of Bravin's activities, RED should also be entitled to punitive damages against the Defendants.

… … …

… … …

Complaint

# TENTH CAUSE OF ACTION

## Negligent Interference with Prospective Economic Advantage

113.   The allegations of paragraphs 1 through 103 are repled and realleged as though fully set forth herein.

114.   This is a claim for interference with prospective economic advantage against both Defendants, arising out of the potential acquisition of Band Pro by RED. Jurisdiction over this claim is proper under 18 U.S.C. § 1367.

115.   Beginning in 2009 and continuing through 2010, RED was in discussions with Band Pro about a potential acquisition. RED was considering acquiring Band Pro. The principal negotiators of the deal were Jim Jannard, for RED, and Amnon Band, for Band Pro. However, Bravin was also aware of the discussions. As such, Bravin was aware of the sensitive nature of the discussions, and the importance of their propriety, and owed RED a duty to not interfere with the potential acquisition.

116.   RED is informed and believes, and thereupon alleges, that part of the purpose of Bravin hacking the Band Pro servers was to gain further information regarding the potential acquisition by RED. RED is further informed and believes, and thereupon alleges, that Bravin shared with ARRI the fact that RED was attempting to acquire Band Pro.

117.   After learning that Bravin had hacked the Band Pro email server, RED was concerned about what information regarding a potential acquisition had been wrongly discovered. Moreover, Bravin being a former Band Pro employee cast a shadow over Band Pro's reputation going forward. Consequently, the acquisition of Band Pro had lost its value to RED.

118.   RED is informed and believes, and thereupon alleges, that Bravin, with ARRI's knowledge and consent, hacked the email system in an effort to gain access to information regarding the acquisition.

… … …

Complaint

119.   RED is further informed and believes, and thereupon alleges, that Bravin, with ARRI's knowledge and consent, posted injurious messages on RedUser in an effort to undermine both RED and Band Pro, and interfere with the potential acquisition.

120.   As a result of Bravin's hacking and false posts on RedUser, RED determined to not acquire Band Pro.  As a result, RED was directly damaged, in an amount to be proven at trial. Given the malicious and offensive nature of Bravin's activities, RED should also be entitled to punitive damages against the Defendants.

## ELEVENTH CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage

121.   The allegations of paragraphs 1 through 32 are repled and realleged as though fully set forth herein.

122.   This is a claim against ARRI for negligent interference with prospective economic advantage arising out of action taken by ARRI agents on the set of Hansel and Gretel. Jurisdiction over this claim is proper under 18 U.S.C. § 1367.

123.   In 2011, shooting was taking place on a feature film in Germany and the United States called "Hansel &  Gretel: Witch Hunters."  The film was being shot in large part on RED ONE M-X cameras. The handling of all the cameras and support of the cameras was being handled by ARRI personnel during the shoot.

124.   On or about March 2011, while on location in Germany, ARRI personnel hot swapped some cables on the RED ONE M-X camera shooting that day. Their acts caused the RED ONE camera to stop working and lose footage. The result was a disappointment for the shooting crew.

125.   ARRI personnel were responsible for maintaining the camera. However, they were not competent and instead damaged the camera.  As a direct result of the failure of the RED ONE camera, the ARRI Alexa conveniently

Complaint

replaced the RED ONE camera on the shoot, and continued throughout the shoot.

126.   RED has been damaged as a result of the actions of ARRI on the set of Hansel & Gretel in an amount that is not yet determined, but which will be proven at trial. ARRI knew, or should have known, that its acts were intended to and would injure RED and its reputation throughout Hollywood.

## TWELFTH CAUSE OF ACTION

### Negligence

127.   The allegations of paragraphs 1 through 32 and 121 through 126 are repled and realleged as though fully set forth herein.

128.   This is a claim against ARRI for negligence. Jurisdiction over this claim is proper under 18 U.S.C. § 1367.

129.   In 2011, shooting was taking place on a feature film in Germany and the United States called "Hansel & Gretel: Witch Hunters."  The film was being shot in large part on RED ONE M-X cameras.

130.   The handling of all the cameras and support of the cameras was being handled by ARRI personnel during the shoot. As such, ARRI and its employees, agents, and representatives, owed RED a duty of care to handle the RED cameras properly and appropriately with skill, and certainly with the same degree and care as one with ordinary skill in the industry.

131.   On or about March 2011, ARRI personnel hot swapped some cables on the RED ONE M-X camera shooting that day. Anyone with ordinary skill in the industry would know not to hot swap cables on a digital cinema camera while filming. Their acts caused the RED ONE camera to stop working and lose footage.  The result was a disappointment for the shooting crew.

132.   ARRI personnel were responsible for maintaining the camera. However, they were not competent and instead damaged the camera.  As a direct result of the failure of the RED ONE camera, the ARRI Alexa replaced the RED ONE camera on the shoot, and continued throughout the shoot.

Complaint

133.   RED has been damaged as a result of the actions of ARRI on the set of Hansel and Gretel in an amount that is not yet determined, but which will be proven at trial. ARRI knew, or should have known, that its acts were intended to and would injure RED and its reputation throughout Hollywood.

## THIRTEENTH CAUSE OF ACTION

### Trespass To Chattels

134.   The allegations of paragraphs 1 through 29 and 121 through 126 are repled and realleged as though fully set forth herein.

135.   This is a claim against ARRI for trespass to chattels. Jurisdiction over this claim is proper under 18 U.S.C. § 1367.

136.   In March 2011, shooting was taking place on a feature film in Germany called "Hansel & Gretel: Witch Hungers." The film was being shot in large part on RED ONE cameras. RED was the owner of the RED ONE cameras, which were rented to the production studio for the shoot.

137.   The handling of all the cameras and support of the cameras was being handled by ARRI personnel during the shoot. The ARRI personnel knew that the RED ONE camera was the property of RED.

138.   RED is informed and believes, and thereupon alleges, that the ARRI personnel intended to and did interfere with RED's rights of possession of the camera. On or about March 2011, ARRI personnel hot swapped some cables on the RED ONE camera shooting that day. Anyone with ordinary skill in the industry would know not to hot swap cables on a digital cinema camera while filming. RED is informed and believes, and thereupon alleges, that these acts were purposely taken to cause damage to the camera.

139.   In fact, the acts of ARRI's personnel did cause the RED ONE camera to stop working and lose footage. The result was a disappointment for the shooting crew.

… … …

Complaint

140.   The acts of ARRI's representatives changed the character of the camera and caused it damage. As a direct result of the failure of the RED ONE camera, the ARRI Alexa replaced the RED ONE camera on the shoot, and continued throughout the shoot.

141.   RED has been damaged as a result of the actions of ARRI on the set of Hansel and Gretel in an amount that is not yet determined, but which will be proven at trial. ARRI knew, or should have known, that its acts were intended to and would injure RED and its reputation throughout Hollywood.

## FOURTEENTH CAUSE OF ACTION

### Unjust Enrichment

142.   The allegations of paragraphs 1 through 141 are repled and realleged as though fully set forth herein.

143.   This is a claim for unjust enrichment against both Defendants. Subject matter jurisdiction is proper under 28 U.S.C. § 1367.

144.   The Defendants' email hacking, false advertising, unfair competition, and other acts of deception were designed to ensure that their Alexa camera quickly came to market in a competitive manner with the RED cameras. Defendants' actions unjustly conferred a benefit to them, at the expense of RED.

145.   Defendants' acts violate principles of justice, equity and good conscience. Such acts have caused Defendants to be unjustly enriched to the detriment of RED.

146.   As a result of the unjust enrichment of Defendants, RED seeks an accounting and disgorgement from the Defendants equal to their profits from their sale of the Alexa products based on the unjust benefit they received from the acts set forth above.

… … …

… … …

WHEREFORE, Plaintiff Red.com, Inc. prays as follows:

1. That Defendants, jointly and severally, be held liable for statutory unfair competition invasion of privacy, and conversion based on email hacking by Bravin;

2. That Plaintiff be awarded damages against Defendants in an amount to be prove at trial;

3. That Defendant ARRI be ordered to disgorge to Plaintiff its profits from the sale of products benefiting from the acts of unfair competition;

4. That Defendants, jointly and severally, be held liable for misappropriation of trade secrets, and that Plaintiff be awarded damages equal to Defendants' profits from the sale of products benefiting from the unlawful acts described above;

5. That Defendants, jointly and severally, be held liable for interference with RED's prospective economic advantage arising from the potential acquisition of Band Pro;

6. That Defendant ARRI be held liable for the negligent interference, negligence, and trespass to RED's cameras in the filming of Hansel & Gretel: Witch Hunters, and be ordered to compensate RED for its damages in an amount to be proven at trial, but in no event less than $75,000;

7. That RED be awarded statutory and compensatory damages reasonably calculated to compensate it for its losses, including lost profits and lost goodwill caused by Defendants wrongful acts;

8. For an order compelling Defendants to return all information about, discussing, or related to RED obtained from Bravin while hacking the Band Pro email server;

... ... ...

Complaint

9.    For an order compelling Defendants to deliver and destroy all business plans and strategies developed in reliance on information gained from Bravin hacking the Band Pro email server;

10.    That a preliminary and permanent injunction be entered, prohibiting Defendants from engaging in false advertising and requiring Defendants to engage in mitigating and corrective advertising;

11.    That punitive damages be assessed against Defendants and awarded to RED as a result of their unlawful activities;

12.    That RED be awarded the amount of the benefit conferred on the Defendants as a result of their unjust enrichment and bad acts;

13.    That RED be awarded its reasonable attorneys' fees and costs; and

14.    That RED have such other and further relief as the circumstances of this case may require and as this court may deem just and proper.

DATED: 12/20/2011        WEEKS, KAUFMAN, NELSON & JOHNSON

GREGORY K. NELSON
Attorney for Plaintiff Red.com, Inc.

## JURY DEMAND

Plaintiff Red.com, Inc. hereby requests a trial by jury in this matter.

DATED: 12/20/2011        WEEKS, KAUFMAN, NELSON & JOHNSON

GREGORY K. NELSON
Attorney for Plaintiff Red.com, Inc.

Complaint

Name & Address:
Gregory K. Nelson, Esq., CSB No. 58584
Weeks, Kaufman, Nelson & Johnson
462 Stevens Avenue, Suite 310
Solana Beach, CA 92075

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RED.COM, INC., dba RED DIGITAL CAMERA, a Washington corporation <br><br> PLAINTIFF(S) <br><br> v. <br><br> ARRI, INC., a Delaware corporation, and MICHAEL BRAVIN, an individual <br><br> DEFENDANT(S). | CASE NUMBER <br><br> **SACV11-01972 CJC (ANx)** <br><br><br><br> **SUMMONS** |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Gregory K. Nelson, Esq._____, whose address is _Weeks, Kaufman, Nelson & Johnson, 462 Stevens Ave., #310, Solana Beach, CA 92075__. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Dated:  DEC 2 1 2011    Clerk, U.S. District Court

By: _____

JIMMY DEAVILA

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
RED.COM, INC., dba RED DIGITAL CAMERA, a Washington corporation

**DEFENDANTS**
ARRI, INC., a Delaware corporation, and MICHAEL BRAVIN, an individual

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Gregory K. Nelson, Esq.
Weeks, Kaufman, Nelson & Johnson
462 Stevens Avenue, Suite 310, Solana Beach, CA 92075

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No  ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. Section 1121 and 28, U.S.C. Sections 1131, 1132 and 1367

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☒ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accom-modations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | IMMIGRATION | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

### SACV11-01972 CJC (ANx)

FOR OFFICE USE ONLY:   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)   CIVIL COVER SHEET   Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)    ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                                ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                                ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                                ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
    **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER):  _[signature]_                    Date  12/21/2011

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

CV-71 (05/08)                       **CIVIL COVER SHEET**                       Page 2 of 2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV11- 1972 CJC  (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=======================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] Western Division | [X] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY